WK/ABS:DJ/RAP
F. #2018R00150

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

OLEG RUBENOV,

               Defendant.

- - - - - - - - - - - - - - - - X

18 M 199

**TO BE FILED UNDER SEAL**

AFFIDAVIT IN SUPPORT OF
APPLICATION FOR AN
ARREST WARRANT

(18 U.S.C. §§ 1347 and 3551 et seq.)

EASTERN DISTRICT OF NEW YORK, SS:

    MICHELLE SPERRUGGIA, being duly sworn, deposes and states that she is a Special Agent with the United States Department of Health and Human Services, Office of the Inspector General ("HHS-OIG"), duly appointed according to law and acting as such.

    Upon information and belief, in or about and between January 2010 and August 2016, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant OLEG RUBENOV, together with others, did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud one or more health care benefit programs, as defined in Title 18, United States Code, Section 24(b), to wit: Medicare and Medicaid, and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property owned by, and under the custody and control of, said health care benefit programs, in connection with the delivery of and payment for health care benefits, items and services.

    (Title 18, United States Code, Section 1347)

1

The source of your deponent's information and the grounds for her belief are as follows:

1. I have been an HHS-OIG Special Agent for approximately seven years. During my tenure with HHS-OIG, I have been involved in the investigation of numerous cases involving criminal health care fraud, during the course of which I have interviewed witnesses, conducted physical surveillance, executed search warrants and reviewed health care claims data, bank records, telephone records, medical records, invoices and other business records. I am familiar with the records and documents maintained by health care providers and the laws and regulations related to the administration of the Medicare and Medicaid programs and other health care benefit programs. I currently am assigned to investigate health care fraud violations, including schemes to defraud the Medicare and Medicaid programs.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation, my review of the investigative file and from reports of other law enforcement officers involved in the investigation.

3. Except as explicitly set forth below, in this Complaint I have not distinguished between facts of which I have personal knowledge and facts of which I have hearsay knowledge. Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware. Instead, I have set forth only those facts, in substance and in pertinent part, that I believe are necessary to establish probable cause for the issuance of an arrest warrant.

I.   Background

    A.   The Medicare and Medicaid Programs

        4.   The Medicare program ("Medicare") was a federal health care program providing benefits to persons who were 65 years old or disabled. Medicare was administered by the Centers for Medicare & Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who received benefits under Medicare were referred to as Medicare "beneficiaries."

        5.   The New York State Medicaid program ("Medicaid") was a federal and state health care program providing benefits to individuals and families who met specified financial and other eligibility requirements, and certain other individuals who lacked adequate resources to pay for medical care. CMS was responsible for overseeing the Medicaid program in participating states, including New York. Individuals who received benefits under Medicaid were similarly referred to as Medicaid "beneficiaries."

        6.   Medicare and Medicaid were each a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

        7.   Medicare was divided into multiple parts. Medicare Part B covered the costs of physicians' services and outpatient care, including occupational therapy, physical therapy and diagnostic tests. Generally, Medicare Part B covered these costs only when, among other requirements, the services were medically necessary, ordered by a physician, actually rendered and not induced by the payment of remuneration.

        8.   Medicaid covered the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products covered by Medicaid were ambulette

3

transportation services, occupational therapy, physical therapy and diagnostic tests. Generally, Medicaid covered these costs only if, among other requirements, the services were medically necessary, ordered by a physician, actually rendered and not induced by the payment of remuneration.

9. In order to bill Medicare and Medicaid for the cost of treating Medicare and Medicaid beneficiaries and providing related benefits, items and services, medical providers and suppliers were required to apply for and receive a provider identification number ("PIN") or provider transaction access number ("PTAN") from each program. The PIN/PTAN allowed medical providers and suppliers to submit bills, known as claims, to Medicare and Medicaid to obtain reimbursement for the cost of treatment and related health care benefits, items and services that they had supplied or provided to beneficiaries.

10. A medical provider was required to be enrolled in Medicare and Medicaid in order to submit claims. In order to enroll in the Medicare program, a medical provider was required to enter into an agreement with CMS in which the provider agreed to comply with all applicable statutory, regulatory and program requirements for reimbursement from Medicare. By signing the Medicare enrollment application, the provider certified that the provider understood that payment of a claim was conditioned on the claim and the underlying transaction complying with Medicare regulations, Medicare program instructions and the law, and on the provider's compliance with all applicable conditions of participation in Medicare. A similar agreement was required of medical providers enrolled in the Medicaid program.

11. Medical providers and suppliers were authorized to submit claims to Medicare and Medicaid only for services that were medically necessary, actually rendered and not induced by payment of a kickback.

4

12. To receive reimbursement from Medicare for covered services and items, medical providers were required to submit claims, either electronically or in writing, through Forms CMS-1500 or Forms UB-92. To receive reimbursement from Medicaid for covered services, medical providers were required to submit claims, either electronically or in writing, through New York State eMedNY-150003 Claim Forms. Each claim form required the medical provider to identify, among other information, the medical provider submitting the claim, the medical provider rendering the service, the referring physician, the patient and the services rendered. Each claim form required the provider to certify, among other things, that the services were not induced by kickbacks, were rendered to the patient and were medically necessary.

13. Providers submitted claims to Medicare and Medicaid using billing codes, also called current procedural terminology or "CPT" codes, which specifically identified the medical services provided to beneficiaries.

14. Ambulette companies provided transportation services for beneficiaries in non-emergency situations. Ambulette transportation services were covered by Medicaid. As with other medical providers, ambulette companies were required to apply for enrollment, and to be enrolled, in the Medicaid program in order to submit claims for reimbursement to Medicaid.

B. The Defendant and Related Entity

15. The defendant OLEG RUBENOV was the owner of Manhattan Ambulette Inc. ("Manhattan Ambulette"), an ambulette company that provided transportation services to Medicare and Medicaid beneficiaries. Manhattan Ambulette transported beneficiaries to medical clinics located throughout Brooklyn and submitted claims to Medicaid as if the transporation services were medically necessary, provided by a licensed Medicaid provider and not induced by remuneration.

16. Manhattan Ambulette was a New York corporation located at 102-32 65th Avenue, #37A, Forest Hills, New York, among other locations.

C. Co-conspirators and Related Entities

17. Co-conspirator 1 ("CC-1"), an individual whose identity is known to me, was one of the managers of several medical clinics in Brooklyn, New York, including a clinic located at 2911 Surf Avenue, among other locations, (collectively referred to as the "CC-1 Clinics") that purported to provide occupational therapy, physical therapy, diagnostic testing, chiropractic and other services to Medicare and Medicaid beneficiaries and caused the submission of claims to health care benefit programs for such services. Together with others, CC-1 managed the CC-1 Clinics from approximately 2010 through 2014.

18. Co-conspirator 2 ("CC-2"), an individual whose identity is known to me, worked at the CC-1 Clinics from approximately 2010 through 2015. CC-2 also owned several medical clinics, including a medical clinic located at 2478 Ocean Ave, Brooklyn, New York, among other locations (collectively referred to as the "CC-2 Clinics"). The CC-2 Clinics purported to provide occupational therapy, physical therapy and diagnostic testing services to Medicare and Medicaid beneficiaries and caused the submission of claims to health care benefit programs for such services. The CC-2 Clinics operated from approximately 2014 through 2016.

19. Co-conspirator 3 ("CC-3"), an individual whose identity is known to me, was the manager of the CC-2 Clinics.

20. Co-conspirator 4 ("CC-4"), an individual whose identity is known to me, was a licensed occupational therapist authorized to participate in the Medicare program. In approximately August 2010, CC-4 incorporated Company-1, a New York corporation the identity of which is known to me. Between approximately July 2015 and March 2016, CC-4,

6

through Company-1, purported to provide occupational therapy services to Medicare beneficiaries at the CC-2 Clinics.

II.     The Fraudulent Scheme

        21.     Between approximately January 2010 and August 2016, the defendant OLEG RUBENOV, together with others, including CC-1, CC-2, CC-3 and CC-4, agreed to execute and executed a scheme whereby they: (a) artificially and corruptly increased demand for medical services by providing Medicare and Medicaid beneficiaries with cash payments to induce those beneficiaries to subject themselves to medical procedures, services and tests; (b) paid illegal kickbacks to patient recruiters and others in return for providing beneficiaries to multiple medical clinics; (c) submitted and caused to be submitted claims to Medicare and Medicaid for medical services that were fraudulently induced by cash kickbacks paid to beneficiaries, not medically necessary or mispresented who provided the services; and (d) engaged in deceptive acts and contrivances intended to hide information, mislead, avoid suspicion and avert further inquiry into the scheme.

        22.     Law enforcement officers have interviewed CC-1 on several occasions between February 2016 and the present. During these interviews, CC-1 stated, in substance and in part, that CC-1 had an illegal kickback arrangement with the defendant OLEG RUBENOV wherein CC-1 paid RUBENOV a per patient kickback for supplying patients for various medical clinics and that RUBENOV, in turn, paid kickbacks to patients to induce those beneficiaries to subject themselves to medical procedures, services and tests. Among other things, in sum and substance, CC-1 stated the following:

        (a)     RUBENOV recruited patients for the CC-1 Clinics.

    (b) Ambulette drivers, like RUBENOV, who recruited patients were paid approximately $30-$50 per patient per day that a patient attended the CC-1 Clinics.

    (c) RUBENOV was one of several ambulette drivers that provided patients for the CC-1 Clinics.

    23. Law enforcement officers, including me, have interviewed CC-2 on several occasions between August 2017 and the present. During these interviews, CC-2 stated, in substance and in part, that CC-2 had an illegal kickback arrangement with the defendant OLEG RUBENOV wherein CC-2 paid RUBENOV a per patient kickback for supplying patients for the CC-2 Clinics and that RUBENOV, in turn, paid kickbacks to patients to induce those beneficiaries to subject themselves to medical procedures, services and tests. Among other things, in sum and substance, CC-2 stated the following:

    (a) From at least 2010, CC-2 performed diagnostic tests at the CC-1 Clinics and knew RUBENOV as a driver who supplied patients for the CC-1 Clinics. Ambulette drivers who provided patients for the CC-1 Clinics were paid a per patient kickback for supplying patients, and the patients were in turn paid a kickback for submitting themselves to medical services.

    (b) In or about April 2015, CC-2 opened the CC-2 Clinics and CC-2 paid patient recruiters, including RUBENOV, an approximately $30 kickback per patient per day brought to the CC-2 Clinics for medical services.

    (c) RUBENOV was a driver with Manhattan Ambulette and he was a recruiter who brought patients to the CC-2 Clinics in exchange for kickback payments.

8

(d)     RUBENOV received cash kickbacks from CC-2 in return for providing beneficiaries for occupational therapy, physical therapy and diagnostic testing services at the CC-2 Clinics.

(e)     RUBENOV made and caused to be made kickback payments to beneficiaries to induce those beneficiaries to submit themselves to medical services at the CC-2 Clinics.

24.     Law enforcement officers, including me, have interviewed CC-3 on several occasions between August 2017 and the present. During these interviews, CC-3 stated, in substance and in part, that CC-3 maintained spreadsheets that tracked the patients brought by the recruiters, including the defendant OLEG RUBENOV, to the CC-2 Clinics in order to calculate the amount of the kickback. Among other things, in sum and substance, CC-3 stated the following:

(a)     RUBENOV was a driver with Manhattan Ambulette and he was a recruiter who brought patients to the CC-2 Clinics in exchange for kickback payments.

(b)     CC-3 tracked the patients brought to the CC-2 Clinics by each ambulette driver, including RUBENOV, in order to calculate the amount of the kickbacks owed to each ambulette driver.

(c)     Generally, RUBENOV met with CC-3 approximately once a week to receive the cash kickbacks for patient referrals. RUBENOV in turn passed along a portion of that cash to beneficiaries to induce them to submit themselves to medical services at the CC-2 Clinics.

25.     Law enforcement officers have interviewed CC-4 on several occasions between May 2015 and the present. During these interviews, CC-4 stated, in substance and in

part, that CC-4 paid the defendant OLEG RUBENOV a per patient kickback for supplying patients for occupational therapy. Among other things, in sum and substance, CC-4 stated the following:

(a) CC-4 provided occupational therapy services at the CC-2 Clinics.

(b) CC-2 and CC-3 paid ambulette drivers, including RUBENOV, an approximately $30 kickback per patient per visit to bring patients to the CC-2 Clinics, and that patients at the CC-2 Clinics were in turn paid kickbacks in order to subject themselves to medically unnecessary treatments, including occupational therapy, physical therapy and diagnostic tests.

(c) Prior to working at the CC-2 Clinics, RUBENOV brought patients to CC-4's own clinic and CC-4 paid RUBENOV an approximately $30 kickback per patient per day RUBENOV brought for occupational therapy at CC-4's own clinic.

26. The description of the scheme provided by CC-1, CC-2, CC-3 and CC-4 was corroborated by the bank records, Medicaid application and data, Medicare data and spreadsheets maintained by CC-3.

27. I have reviewed JPMorgan Chase bank account records held in the name of Manhattan Ambulette and I have learned that the defendant OLEG RUBENOV was a signatory and was identified as the vice-president of Manhattan Ambulette since approximately March 2009. I have also reviewed a stock sale agreement dated December 31, 2012 for Manhattan Ambulette in which RUBENOV was identified as the purchaser and sole shareholder. I have also reviewed Medicaid documents and claims data for Manhattan Ambulette. Based on my review of the Medicaid documents, I have learned that RUBENOV filed paperwork identifying himself as the owner of Manhattan Ambulette in or about September 2013. Based on

my review of the Medicaid claims data for Manhattan Ambulette, I have learned that between approximately January 2010 and August 2016, RUBENOV submitted or caused to be submitted approximately 178,000 claims to Medicaid for ambulette transportation services. He billed and was paid approximately $10.8 million for those claims.

28. I have also reviewed the spreadsheets maintained by CC-3. Based on my review of these documents, I have learned that between approximately July 2015 and August 2016, the defendant OLEG RUBENOV received approximately $386,000 from CC-2 and CC-3 in return for providing patients to the CC-2 Clinics for purported occupational therapy, physical therapy and diagnostic testing services.

29. I have also reviewed Medicare claims data for Company-1. My review of Company-1's Medicare claims data in conjunction with Manhattan Ambulette's Medicaid claims data and the spreadsheets described above corroborated CC-2, CC-3 and CC-4. I identified particular patients for which Manhattan Ambulette billed Medicaid for transportation services on specific days. I determined that Company-1 billed Medicare for occupational therapy services for those patients. The spreadsheets maintained by CC-3 further indicate that RUBENOV delivered those patients to the CC-2 Clinics in exchange for a kickback on those dates. For example, the spreadsheet indicates that on August 24, 2015, Individual-1 was brought to the CC-2 Clinic by RUBENOV. Medicaid paid Manhattan Ambulette $50 for transportation services and Medicare paid CC-4 $93.63 for occupational therapy services purportedly provided on that date to Individual-1. Similarly, the spreadsheet indicates that on September 11, 2015, Individual-2 was brought to the CC-2 Clinic by RUBENOV. Medicaid paid Manhattan Ambulette $66 for transportation services and Medicare paid CC-4 $95.71 for occupational therapy services purportedly provided on that date to Individual-2.

11

III.  Conclusion and Application

30. Based upon my training and experience, as well as my analysis of the billing data, witness interviews and documents, there is probable cause to believe that the defendant OLEG RUBENOV engaged in a scheme to defraud Medicare and Medicaid by artificially and corruptly increasing demand for medical services by providing Medicare and Medicaid beneficiaries with cash payments to induce those beneficiaries to subject themselves to medical procedures, services and tests; paying illegal kickbacks to patient recruiters and others in return for providing beneficiaries to multiple medical clinics; submitting and causing to be submitted claims to Medicare and Medicaid for medical services that were fraudulently induced by cash kickbacks paid to beneficiaries; and engaging in deceptive acts and contrivances intended to hide information, mislead, avoid suspicion and avert further inquiry into the scheme, in violation of Title 18, United States Code, Section 1347.

31. I respectfully request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the instant complaint and application and related arrest warrant. The defendant is currently at liberty, and it is respectfully submitted that sealing these documents is necessary to prevent the defendant from learning that a complaint has been filed and an arrest warrant issued, and thus to prevent the defendant from avoiding arrest and prosecution.

32. WHEREFORE, I respectfully request that the Court issue a warrant for the arrest of defendant OLEG RUBENOV so that he may be brought before the Court and be dealt with according to law.

_____
MICHELLE SPERRUGGIA
Special Agent, HHS-OIG

Sworn to before me this
5th day of March, 2018

_____
TH[...] M. LEVY
UN[...] TE JUDGE
EA[...] YORK

13